RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0114p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

PATRICIA MACINTOSH,

        *Plaintiff-Appellee*,

    *v*.

RON CLOUS, Grand Traverse County Commissioner,
in his individual capacity,

        *Defendant-Appellant*.

No. 22-1015

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00309—Phillip J. Green, Magistrate Judge.

Argued: October 20, 2022

Decided and Filed: May 31, 2023

Before: SUTTON, Chief Judge; STRANCH and DAVIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC, Farmington Hills, Michigan, for Appellant. Blake K. Ringsmuth, RINGSMUTH WUORI PLLC, Traverse City, Michigan, for Appellee. **ON BRIEF:** Marcelyn A. Stepanski, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC, Farmington Hills, Michigan, for Appellant. Blake K. Ringsmuth, RINGSMUTH WUORI PLLC, Traverse City, Michigan, for Appellee.

     STRANCH, J., delivered the opinion of the court in which DAVIS, J., joined. SUTTON, C.J. (pp. 15–22), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

JANE B. STRANCH, Circuit Judge.   During the public comment period in a Zoom meeting of the Grand Traverse County Commission, Patricia MacIntosh expressed her concern about the Commission's prior invitation to and endorsement of the Proud Boys, a group that has been designated an extremist group and a hate group.   She requested that the Commissioners make a public statement condemning the group's violent behavior.   In response, Commissioner Ron Clous produced a high-powered rifle and displayed it to MacIntosh and the viewing audience.   MacIntosh sued Clous and the County, alleging that Clous unconstitutionally retaliated against her for exercising her First Amendment rights and that the County had an unconstitutional policy or practice of allowing this kind of First Amendment retaliation. Defendant Clous appeals the district court's denial of his motion to dismiss based on qualified immunity.   Because MacIntosh plausibly alleged that Clous violated MacIntosh's free speech rights and Sixth Circuit caselaw put him on clear notice that his actions were unconstitutional, we affirm the denial of Clous's motion to dismiss.

**I.  BACKGROUND**

In this appeal challenging the denial of a motion to dismiss, we accept as true the well-pleaded facts in the complaint.   *See Rudd v. City of Norton Shores,* 977 F.3d 503, 507 (6th Cir. 2020).   The Defendants also attached the full video of the meeting in question as an exhibit to their motion to dismiss.   "[A] court ruling on a motion to dismiss 'may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.'"   *Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) (quoting *New England Health Care Emps. Pension Fund v. Ernst & Young*, *LLP*, 336 F.3d 495, 501 (6th Cir. 2003)) (emphasis omitted).   We take judicial notice of the video recording of the public government meeting and consider it along with the complaint and its exhibits, which provide the following facts.

Around March 4, 2020, the Grand Traverse County Commission held a Board meeting to which it invited at least two members of the Proud Boys, a group that has been designated an extremist and hate group: For instance, the group was notorious for organizing a 2017 white supremacist rally in Charlottesville, Virginia, at which a woman was killed. At that Commission meeting, the Proud Boys members spoke in favor of a resolution that would designate the county a "Second Amendment Sanctuary" and at least one of them carried a firearm. The Commission passed the resolution and praised the Proud Boys, despite their known violence and support of white supremacy.

Following the March 2020 Commission meeting, the Proud Boys and other militia groups were linked to other political violence in Michigan and across the country. In May 2020, a group of militia members that included members of the Proud Boys stormed Michigan's Capitol with assault weapons in an attempt to intimidate the state government and coerce it to change COVID-19 safety policies. In October 2020, members of another violent group plotted to kidnap and kill Michigan's governor, Gretchen Whitmer. And in January 2021, a violent mob that included Proud Boys members mounted an insurrection at the Capitol building in Washington, D.C., during which five people were killed and multiple others injured.

On January 20, 2021, fourteen days after the January insurrection, the Grand Traverse County Board of Commissioners held a public meeting on Zoom (due to the ongoing pandemic) that included a public comment portion. Many citizen attendees dialed in by phone, but the Commissioners, including Clous, were visible on video. Directly before MacIntosh gave public comment, a County citizen identified as Kate Dahlstrom spoke. Dahlstrom criticized the Commission for allowing the Proud Boys to speak at the earlier County Commission meeting, noted that the Proud Boys have been labeled a hate group and an extremist group, and asked the Board members to publicly state that they did not belong to "this hate, extremist, and white supremacist group, or any similar group." In response, the Board Chairman chastised her in an aggressive outburst and defended the Proud Boys, arguing that they were not a hate group. He ended by telling her that her opinions and political speech were not welcome in the meeting, specifically stating that "I don't really appreciate this forum being used to spread misinformation about me or groups; you can do that in your magazines or editorials." The Complaint alleges

that it was unusual for Commissioners to respond to public comment rather than listening; another Commissioner questioned the Chair's actions, asking whether it was appropriate to be responding to public comment in that manner. In response to that Commissioner's question, the Chairman again responded in an irritated tone, accusing Dahlstrom of "spreading lies."

MacIntosh was the next to speak during the public comment period. She criticized the Commission's actions supporting the Proud Boys, expressing concern about the Proud Boys' participation in the violent insurrection at the nation's Capitol building, which she compared to political violence in their own state—such as the occupation of the Michigan Capitol building by people with assault rifles and the plot to kidnap and murder Michigan's governor. MacIntosh then asked the Commission to "please make some sort of a public statement for the community that you do not accept the behaviors" of the Proud Boys and similar violent groups. In response, Clous stood up and briefly left the frame, returning with a high-powered rifle that he displayed to the camera with a smirk. The Board Chairman laughed. Clous admits that he got his rifle in response to MacIntosh's public comment.

MacIntosh alleges that Clous's actions made her feel fearful, intimidated, and physically threatened. Fear and concern for her safety have deterred MacIntosh from speaking at subsequent public governmental meetings, including at meetings held to address Clous's conduct toward her. And MacIntosh also alleges that due to Clous's actions, she began to receive threatening, anonymous communications late at night and has felt compelled to make a report to the police for her own protection.

Publicly elected officials and other community members also expressed concern and fear. At a special meeting held to address Clous's actions, about 100 community members made comments over four hours, "the great majority" of which "expressed shock, fear, and anger" at Clous's behavior. Some people making public comment at this meeting said that they were afraid to give their names—more simply refused to give their names when asked. Another Commissioner felt that the incident was serious enough to merit proposing a resolution to censure Clous, which the Commission voted down. The local newspaper published an editorial characterizing Clous's behavior as intimidating conduct designed to discourage MacIntosh from speaking freely.

MacIntosh sued Clous and the County, bringing a First Amendment retaliation claim against Clous and an unconstitutional policy or practice claim against the County. Both defendants moved to dismiss, with Clous asserting a qualified immunity defense; the magistrate judge held a hearing and then denied both motions. Clous timely appealed.

## II. ANALYSIS

Qualified immunity protects governmental officials from suit as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The ultimate question is "whether a reasonable [official] could have believed [the challenged action] to be lawful, in light of clearly established law and the information [he] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). A qualified immunity analysis requires a two-pronged inquiry. The first prong addresses whether the facts, "when taken in the light most favorable to the party asserting the injury, show the [defendant's] conduct violated a constitutional right." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). The second prong asks whether the right was "clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Although the plaintiff ultimately bears the burden of showing that a defendant is not entitled to qualified immunity, that burden is not high at the 12(b)(6) stage: Reading the complaint in the light most favorable to the plaintiff, it need only be "plausible" that an official's acts violated a clearly established constitutional right. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562 (6th Cir. 2011)). And although qualified immunity is available at the motion to dismiss stage, "it is generally inappropriate . . . to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). As we have often explained, "an officer's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest point,'" but "that point is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Wesley*, 779 F.3d at 433–34). This is for good reason—development of the factual record is

"frequently necessary to decide whether the official's actions violated clearly established law." *Id.*

Clous argues that he did not violate MacIntosh's rights because MacIntosh fails to allege an adverse action that would deter a person of ordinary firmness from exercising her First Amendment rights, and because his conduct was his own protected expressive speech.  He also argues that no clearly established law put him on notice that "merely displaying the gun during a remote Zoom meeting in response to requests to stake a position on Second Amendment issues" violated MacIntosh's rights.

## A.  Constitutional Violation

To make out a First Amendment retaliation claim, MacIntosh must show: (1) that she engaged in First Amendment protected activity; (2) that Clous undertook "an adverse action" that would deter "a person of ordinary firmness from continuing to engage in that conduct"; and (3) that there is a "causal connection" between MacIntosh's protected activity and Clous's adverse action.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (per curiam).  The parties do not dispute that Clous acted in response to MacIntosh's public comment, which was protected speech.

Instead, the parties' dispute centers on the second element.  Clous argues that his display of the rifle was not an "adverse action" that would deter a "person of ordinary firmness" from exercising her First Amendment rights, component (2).  *Thaddeus-X*, 175 F.3d at 394.  We explained in *Thaddeus-X* that "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  *Id.* at 386.  An official action is adverse only if it could "'deter a person of ordinary firmness' from the exercise of the right at stake."  *Id.* at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

Whether an action is severe enough to deter a person of ordinary firmness is a question of fact.  *Id.* at 398-99.  Because "nothing justifies 'harassing people for exercising their constitutional rights,'" a deterrent effect on speech "need not be great" to be actionable.  *Anders*, 984 F.3d at 1175 (quoting *Thaddeus-X*, 175 F.3d at 397).  Even at the summary judgment stage,

"[the adverse action] threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed." *Thaddeus-X*, 175 F.3d at 398. Based on this standard, at issue here is whether Clous's "threats or deprivations" qualify as "so de minimis that they do not rise to the level of being constitutional violations." *Id.*

On multiple occasions, we have held that when an official responds to speech with threats of physical harm, that response constitutes an adverse action that would deter a person of ordinary firmness from speaking. In *Thaddeus-X*, the prison officials' actions were adverse when they responded to prisoners' complaints with "physical threats" of assault, along with other harassment and threatened transfer to an undesirable area of the prison. *Id.* at 398-399. And in *Zilich v. Longo*, we held that city officials acted adversely when they threatened to physically harm the plaintiff during a meeting, along with other actions. 34 F.3d 359, 365 (6th Cir. 1994).

The key statements in *Zilich* are particularly relevant here. Zilich, a city council member, made himself "a thorn in the side of the mayor and his administration" by challenging various city policies and actions. *Id.* at 361. During that time, Zilich's home and car were anonymously vandalized, and he and his wife received anonymous, threatening phone calls. *Id.* Contemporaneously, a witness reported to Zilich that he had attended meetings in which the mayor and others discussed silencing Zilich and harming Zilich and his family, including by "shooting him." *Id.* We allowed Zilich to proceed with his First Amendment retaliation claim, reasoning that the defendants were not entitled to qualified immunity because "[no] reasonable official could possibly believe that it is constitutionally permissible to retaliate against a political opponent with physical threats, harassment and vandalism." *Id.* at 365. *Zilich*, moreover, was decided on the more demanding summary judgment standard. Here, on a motion to dismiss standard, MacIntosh need only allege facts that, construed in her favor, make it "plausible" that Clous's acts violated her clearly established constitutional rights. Under the more demanding summary judgment standard, the *Zilich* court found the adverse nature of the defendants' actions "clearly established" for qualified immunity purposes—despite the defendants' claim that their threats had been meant as jokes and even though Zilich himself was not present at the meeting when the defendants made the threats. *Id.* at 364-65.

MacIntosh alleges that she exercised her right to speak before the Commission, requesting that the Commission disavow the Proud Boys' political violence.[1] Clous responded to her protected speech by displaying a high-powered firearm to the camera—a threat with a deadly weapon that MacIntosh interpreted as "a symbolic message to say 'stop or else'" he would use that weapon against her—and the Board Chairman laughed. That action was followed by late night, anonymous, phone calls threatening MacIntosh. *Zilich* applies here: A threat to shoot a person because of her protected speech is an adverse action sufficient to support a First Amendment retaliation claim.

The dissent says Clous's conduct is different in both "kind and lots of degrees" from the mayor's conduct in *Zilich* because the Commission meeting was virtual and Clous's firearm display was relatively short and purportedly a response to MacIntosh's comments. That Clous claimed to be answering MacIntosh, however, does not make his weapon brandishing an "inconsequential action," see *Thaddeus-X*, 175 F.3d at 398, when it deters the exercise of a constitutional right as it did here. And Zilich was not physically present when the mayor made his verbal threats, like MacIntosh, and he did not even hear about them until after the fact. *Zilich* teaches that the ability to immediately carry out a threat is not required. Nor does Clous's silence while flashing his firearm deprive his action of the capacity to convey a threat. In this world of virtual communication, a message can be conveyed through a live image that, in earlier times, might have required a verbal or written exchange. Virtually smirking and displaying a high-powered rifle at someone during a tension-filled public meeting is pregnant with dangerous meaning in the same way as the verbal expression of intent to harm made outside Zilich's presence. Finally, MacIntosh received threatening late-night phone calls, which, like those received in *Zilich* were anonymous and occurred following Clous's threatening behavior. Based on these factual parallels, Clous was on notice that he was accountable for communicating a threat against a citizen who was exercising her right to speak in the public square.

---

[1]The dissent contends that MacIntosh focused on the Second Amendment and the Proud Boys, "not anything that the Commissioners did." But her complaint is that members of the Commission, including Clous, "welcomed" Proud Boys to the meeting "to speak in favor of a resolution designating the county as a Second Amendment Sanctuary." (¶ 10) MacIntosh also alleged that the prior public commenter was aggressively "retaliated against" by the Board for speaking against the Proud Boys. (¶¶ 22-26) She specifically criticized the Commission for its "apparent support of the Proud Boys" and the "tacit endorsement" that "gave to other hate groups." (¶ 26)

The facts alleged in the Complaint also demonstrate that Clous's threat would deter a person of ordinary firmness from speaking at future meetings. MacIntosh plausibly alleges that she was deterred from speaking at—or even attending—later meetings. And other community members were chilled in their speech, as demonstrated by the fact that those who did speak in opposition to Clous's actions at later meetings were afraid to or refused to give their names. The impact of Clous's conduct on multiple community members proves MacIntosh's point—people of ordinary firmness would be deterred or chilled from fully exercising their speech rights. The dissent's suggestion that MacIntosh was not deterred because she was able to finish the last 13 seconds of her comment period ignores the allegations that Clous's actions chilled the continuing exercise of her constitutional rights. MacIntosh amply alleges that Clous's threat deterred her and other ordinary citizens in her community.

MacIntosh's Complaint also alleges that Clous's actions constitute a crime under Michigan law. *See* Mich. Comp. L. 750.234e. And at the motion to dismiss hearing, Clous's attorney conceded that his conduct could "potentially" fall within the definition of the federal crime of "brandishing," which includes "display[ing] all or part of a firearm, or otherwise mak[ing] the presence of a firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person." *See* 18 U.S.C. § 924(c)(4). To be sure, MacIntosh need not establish that Clous's actions were criminal—even acts that are normally permissible can be "adverse" when they deter speech and the persons acting intended to intimidate their target. *Rudd*, 977 F.3d at 514. The deterrent effect of an adverse action, moreover, need not be "great" to be actionable, *Thaddeus-X*, 175 F.3d at 397. That both the Complaint and Clous's own attorney indicate Clous engaged in conduct proscribed by criminal law supports the conclusion that it was "adverse" for First Amendment retaliation purposes.

Clous argues that his action in wielding the rifle was protected as his own "expressive conduct", and that MacIntosh cannot "infringe upon [his] rights by suing him for his expressions of opinion on public matters." But "[a]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." *Bloch*, 156 F.3d at 682 (quoting *Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir. 1984)). We specifically confronted this question in *Bloch*

and rejected the claim that a public official's disclosure of humiliating details of the plaintiff's rape could not be adverse action because it was the official's own First Amendment speech. *Id.* at 681. We held that "[the official's] right to respond to [the plaintiff's] criticism is not unlimited." *Id.* Although public officials have "the right to respond public[ly] to[] criticism lodged against them," they are not permitted to do so "with the intent of injuring the complainant and chilling such a person from continuing to exercise his or her constitutional rights." *Id.* Here, MacIntosh has met her burden to allege that Clous's conduct was motivated by such impermissible intent. Clous's argument is unavailing: under *Bloch*, his conduct constitutes adverse action whether or not it was his own speech.

The dissent turns to *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1261 (2022), to bolster Clous's claim that his speech was protected because he was an elected representative. *Wilson*, however, determined that a board did not violate the First Amendment by censuring its own member for criticizing and suing the board. That decision rested on the narrow historical right of elected officials to censure other elected officials, and expressly clarified that the holding did not address "questions concerning legislative censures. . . aimed at private individuals." *Id.* at 1259, 1261 (reasoning that "[t]he censure at issue [] was a form of speech by elected representatives" that "concerned the public conduct of another elected representative," and "[e]veryone involved was an equal member of the same deliberative body."). *Wilson* does not warn us to be wary of punishing elected officials for their speech against private individuals like MacIntosh. It tells us that it does not apply to unequal interactions between elected officials and private citizens. *Bloch*, however, does address this situation and it tells us that a public official may not speak in response to a private person with the intent to injure her and chill her from exercising her First Amendment rights. 156 F.3d at 682.

Clous also argues that a reasonable person would not have interpreted his actions as a threat, because they occurred in the context of a discussion about the Second Amendment and merely constituted an expression of his opinion on gun rights. But MacIntosh's complaint does not allege that she asked for Clous's opinion on the Second Amendment or guns in general—or that she was speaking on that broad topic. She alleges—and the video shows—that she addressed the welcoming of the Proud Boys who have a reputation for violence "and the tacit

endorsement she felt [the Commission's approval of the Proud Boys] gave to other hate groups that would use violence as a means to their ends." And in doing so, she referenced political violence in Michigan and at the United States Capitol, and requested that the Commission disavow the Proud Boys. MacIntosh alleges that Clous displayed a rifle to her and the viewing audience not during a reasoned debate about Second Amendment rights, but in response to MacIntosh's articulated concerns about the Commission's acceptance of an extremist group and her request that the Commission make a public statement disavowing "the behaviors" of a group known for violence.**2** Placing Clous's actions in the context of the comment by MacIntosh to which he responded makes his threat more clearly adverse, not less so.

Taking her well pleaded facts as true and construing them in her favor, as we must, MacIntosh has met her burden at the motion to dismiss stage to allege an adverse action. She therefore adequately alleges a violation of her First Amendment rights.

## B.  Whether the Right Was Clearly Established

The second prong of the qualified immunity analysis asks whether the right was "clearly established such 'that a reasonable official would understand that what he is doing violates that right.'" *Mullins*, 805 F.3d at 765 (quoting *Saucier*, 533 U.S. at 202). As the Supreme Court has cautioned, articulating the right at issue too generally risks transforming "a guarantee of immunity into a rule of pleading," *Anderson*, 483 U.S. at 639, while articulating it too specifically risks shielding obvious and egregious constitutional violations from liability. *See Hope v. Pelzer,* 536 U.S. 730, 739-41 (2002). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances," and prior cases need not be "fundamentally similar" to the facts at hand to put defendants on notice. *Id.* at 741. Instead, the "salient question" is whether "the state of the law" gives defendants "fair warning" that their actions are unconstitutional. *Id.*

---

**2**In fact, right as Clous reentered the frame with his rifle, MacIntosh was noting that she "certainly appreciate[d] people[] wanting to have their gun rights protected"—further clarifying that she was speaking only to the issue of the Commission's endorsement of the Proud Boys and the political violence they represent. R.16-3 at 1:31:37–1:31:40.

We have answered this question before under analogous circumstances. When confronted with actions that included defendants' discussion of harming the plaintiff by "shooting him," the *Zilich* court concluded that "no reasonable official could possibly believe that it was constitutionally permissible to retaliate against a political opponent" with "physical threats." 34 F.3d at 365. *Zilich* presents a useful parallel to the Zoom meeting here, as Zilich was not present at the meeting during which those defendants made threats; instead, a meeting attendee later told him about the threats. *Id.* at 361. Even though Zilich was not present to hear the threats, and defendants claimed that the threats were "jokes," we concluded that no official of reasonable competence could disagree that the purported physical threats were in fact unconstitutional adverse actions. *Id.* at 364-65 (quoting *Mumford v. Zieba*, 4 F.3d 429, 423 (6th Cir. 1993)).

Like the *Zilich* defendants' verbal threat to shoot the plaintiff, moreover, Clous responded to MacIntosh's request to condemn violence by displaying a high-powered rifle—a visceral threat of harm made clear by the context of the parties' discussion of political violence. The remote nature of the Zoom meeting makes no difference, as *Zilich* made clear that a threat to shoot a person is a qualifying adverse action regardless of whether the targeted person witnesses the threat or whether the threatened harm is likely to occur immediately. 34 F.3d at 364-65. *Zilich* established that threatening gun violence to silence a political opponent constitutes unconstitutional adverse action. Clous had fair warning that it was impermissible to brandish a firearm in response to a citizen's request that he condemn violence.

And in *Thaddeus-X*, as explained earlier, we concluded that an adverse action "is not static across contexts," and that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." 175 F.3d at 398; *see also Rudd*, 977 F.3d at 514 ("We have calibrated the person-of-ordinary-firmness test to the plaintiff"). The *Thaddeus-X* plaintiff was a prisoner, and we concluded there that the plaintiff's allegations, "if true, certainly meet the standard" for adverse treatment because "[h]arassment, *physical threats*, and transfer" within the prison "would likely have a strong deterrent effect" on the plaintiff's protected speech. *Id.* at 398 (emphasis added). Here, Clous's conduct in brandishing a weapon was proscribed by our

conclusion in *Thaddeus-X* that physical threats constitute adverse action—especially because MacIntosh was neither a prisoner nor a public employee. She was instead an average citizen exercising her right to speak during a public comment period at a Commission meeting, the most protected category in determining whether an action is adverse. Here, "[t]he standard is reduced even more. . . because of the plaintiff before the court—an ordinary citizen." *Rudd*, 977 F.3d at 514.

*Zilich* and *Thaddeus-X* therefore clearly proscribe Clous's conduct. But even if we assume that Clous's brandishing of a firearm presented a "novel factual circumstance[]," he still had 'fair warning' that his actions were prohibited. Where "the very action in question has [not] previously been held unlawful," officials can still be on notice that their conduct violates established law if a general statement of the law gives "fair and clear warning." *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)) (alteration in *Hope*). The law's proscription of "adverse action" plainly encompasses threatening a speaker with a high-powered rifle. That the conduct at issue is independently proscribed by state and federal criminal law provides more evidence that brandishing a weapon at someone is "fairly and clearly" adverse.[3]

No reasonable official could believe that it was permissible to brandish a deadly weapon in response to MacIntosh's public comment asking the official to condemn violence. Taken as true, MacIntosh's allegations plausibly show that Clous is not entitled to qualified immunity because it was clearly established that Clous's conduct violated MacIntosh's First Amendment rights. The district court properly denied him qualified immunity.

---

[3]Clous argues that the Supreme Court's opinion in *Reichle v. Howards* requires courts to evaluate both the clarity of the right that was violated and the clear unconstitutionality of the retaliatory conduct itself when determining that a right was clearly established. 566 U.S. 658 (2012). In the context of First Amendment retaliation, our qualified immunity analysis historically focused on whether a defendant intended to retaliate against a plaintiff for clearly established First Amendment-protected activity. *Bloch*, 156 F.3d at 682 ("The unlawful intent inherent in such a retaliatory action places it beyond the scope of a police officer's qualified immunity if the right retaliated against was clearly established.") (quoting *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990)). In *Reichle*, the Supreme Court evaluated a qualified immunity defense to a free speech retaliation claim, determining that "the right in question" there was "not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest[.]" 566 U.S. at 665. The analysis in *Reichle*, however, resulted from the interplay of the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250 (2006) and Tenth Circuit precedent. *See Reichle*, 566 U.S. at 665-670 (reasoning that "a reasonable official also could have interpreted *Hartman's* rationale to apply to retaliatory arrests").

## III.  CONCLUSION

First Amendment law is "particularly context-driven," *Thaddeus-X*, 175 F.3d at 388, and further development of the record is frequently necessary to decide whether qualified immunity is appropriate.  *Anders*, 984 F.3d at 1175.  At the 12(b)(6) stage, taking MacIntosh's well-pleaded facts as true, MacIntosh has alleged a violation of a clearly established constitutional right.  We **AFFIRM** the district court's decision denying Clous's motion to dismiss on qualified immunity grounds and remand the case for further proceedings.

———————————

**DISSENT**

———————————

SUTTON, Chief Judge, dissenting. If you work long enough as a judge, you can expect to see just about everything. Consider this strange but true fact pattern.

Almost one year into the pandemic, the Board of Commissioners of Grand Traverse County met virtually on January 20, 2021. Most commissioners participated from their homes. The same was true for each resident who watched the meeting or engaged with the commissioners during the public comment period. The meeting is captured by video, leaving no room for debate about what happened. About one hour into the public comment period, a citizen raised a concern about the March 2020 meeting, held nine months earlier, in which the Commissioners passed a resolution designating Grand Traverse County as a Second Amendment sanctuary. She objected that the Proud Boys had been invited to speak for 20 minutes in support of the Second Amendment resolution and that they amounted to a hate group. Board Chairman Rob Hentschel responded that this did not happen and that the Proud Boys were not a hate group.

Patricia MacIntosh, a resident of the County, next took the virtual floor. She reiterated the previous citizen's concerns about the March 2020 meeting. She claimed that a resolution designating Grand Traverse County as a Second Amendment sanctuary had emboldened the Proud Boys to threaten the Michigan legislature and the governor. And she claimed that Randy Bishop was invited to speak at the March 2020 meeting and suggested he was a Proud Boy. MacIntosh implored the Board of Commissioners to "make some sort of a public statement for the community that you do not accept the behavior[]" of the Proud Boys and to reconsider its decision to designate Grand Traverse County as a Second Amendment sanctuary. R.16-3 at 1:31:09–1:31:29.

At this point, Commissioner Ron Clous stood up and walked off screen to another part of his house. He reappeared seconds later with his own rifle. Just as he re-entered the frame, MacIntosh was acknowledging that she "certainly appreciate[d] people[] wanting to have their gun rights protected." *Id.* at 1:31:37–1:31:40. Clous lifted his rifle sideways. He smiled,

perhaps smirked. But at no point did he aim the muzzle at the camera. MacIntosh kept speaking. She did not stop until her time elapsed. When she was done, Commission Chair Hentschel noted that Randy Bishop was not a Proud Boy.

MacIntosh sued Clous, alleging that he retaliated against her for exercising her First Amendment rights. This claim has three elements: (1) MacIntosh "engaged in activity the First Amendment protects"; (2) Clous undertook "an adverse action" that would deter "individuals of ordinary firmness from doing what they were doing"; and (3) there is a "causal link" between MacIntosh's protected activity and Clous's adverse action. *Cunningham v. Blackwell*, 41 F.4th 530, 541 (6th Cir. 2022) (quotation omitted).

At this stage of a case involving a fact pattern caught entirely on camera, there is no basis for debating the first and third elements. MacIntosh was engaged in protected speech. And there is a causal link between MacIntosh's speech and Clous's actions. The question is whether Clous's decision to display his own rifle on the screen in response to MacIntosh's comments counted as an adverse action that would dissuade an individual of ordinary firmness from engaging in public comment.

There is one other rub. MacIntosh faces a second hurdle in this § 1983 action. It is not enough to show that Clous engaged in unconstitutional free-speech retaliation. She also must show that the unconstitutionality of Clous's conduct was "beyond debate." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted).

That is a heavy lift, and MacIntosh has not remotely carried it. Whether Clous violated her First Amendment rights, she cannot win in the absence of case law supporting this kind of claim in this kind of context.

No surprise, given the unusual nature of this complaint, the case reporters are barren when it comes to virtual-speech-retaliation claims like this one. Think of what happened. A side view of Commissioner Clous's lawfully possessed rifle. In that official's own home. For a few seconds. During a virtual Board of Commissioners meeting. With everyone participating from the safety of their own homes. In direct response to a citizen's speech about the right to bear arms. Against the backdrop of a community debate about the perils of designating Grand

Traverse County as a Second Amendment sanctuary in a context that suggested support for the Proud Boys. This is not an everyday occurrence in free speech retaliation claims. And it's a complicated occurrence given that Clous's action was itself a form of expression, if a strange and tasteless form of expression, made in response to a citizen's explicit request for a statement. *See Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1261 (2022) (rejecting retaliation claim where retaliatory act "was a form of speech by elected representatives"). That the First Amendment "cannot be used as a weapon to silence" others' opinions, even if unpopular, *id.*, complicates matters further.

Perhaps, from MacIntosh's perspective, the display of the firearm amounted to a true threat, though the virtual nature of the display and the Second Amendment context of the debate at hand seem to cut against that view. So too does the reality that MacIntosh's comments focused mainly on the Second Amendment and the Proud Boys' behavior, rather than anything that the Commissioners did. This contextual wrinkle pushes Clous's conduct even further from a cognizable true threat and much closer to expression. Either way, MacIntosh does not cite a single First Amendment retaliation case that comes close to this fact pattern—and that would have alerted Clous to a forbidden line that he crossed in this unusual setting. What's more, and this is critical, the one case we *do* have—*Wilson*—directly tells us to be wary of punishing elected officials for their speech. *See id.*

Things do not improve when we focus on the pertinent question at hand: Would this virtual display of a rifle deter a person of ordinary firmness from engaging in public comment about the right to bear arms in general and about specific groups of Americans that support such rights in controversial and threatening ways? In support of this showing, MacIntosh alleges Clous's display of the firearm frightened her, caused her to experience physical symptoms of stress, and deterred her from participating in subsequent Board of Commissioners meetings. No one can debate what MacIntosh felt at this stage of the case. But neither can anyone debate what the camera shows she did. MacIntosh was not deterred. She kept speaking. She spoke during Clous's display of the firearm, continued her remarks after Clous set down the firearm, and continued to speak without pausing until her time elapsed. The adverse-action inquiry, it is true, centers on what a person of ordinary firmness would do, not on what MacIntosh herself did or

even felt. *See Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010). But her "behavior" in response to this purported adverse action still "seem[s] telling." *Wilson*, 142 S. Ct. at 1262.

More telling still, MacIntosh does not cite a single case remotely like this one to make the objective showing that a reasonable American citizen would be deterred from continuing to express themselves in this setting. Two recent Supreme Court cases, *Wilson*, 142 S. Ct. at 1261, and *Reichle v. Howards*, 566 U.S. 658 (2012), confirm that this gap in authority creates a problem. In *Wilson*, the Court held that a board of elected officials' censure of a board member did not count as an adverse action for purposes of a retaliation claim. 142 S. Ct. at 1261. Looking to history, tradition, and case law, the Court reasoned that another official's speech would not be "'abridg[ed]'" by "countervailing speech from his colleagues." *Id.* at 1260 (alteration in original). That conclusion counsels us to exercise caution in this complex case too. And it undercuts any argument that expressive conduct counts as an adverse action under clearly established law.

Having hit a speed bump with *Wilson*, MacIntosh's clearly established argument comes to a swift halt with *Reichle*. In granting qualified immunity in the context of a First Amendment retaliation claim, the Court explained that "the right in question [was] not the general right to be free from retaliation for one's speech," but "the more specific right to be free from a retaliatory arrest that [was] otherwise supported by probable cause." 566 U.S. at 665. *Reichle* teaches that the clearly established inquiry does not consist solely of the general right to be free from retaliation for one's speech. It must factor in the actual retaliatory adverse action: there an arrest supported by probable cause; here the display of a rifle during a virtual debate about a resolution with respect to the right to bear arms and concerns about those who have abused the right.

The question, then, is not whether MacIntosh had a clearly established right to be free from retaliation for exercising her First Amendment rights; it is whether she had a clearly established right to be free from the display of a rifle (or equivalent actions) during a virtual Board of Commissioners meeting. That simply has not been shown. Had Clous been an avid consumer of the Federal Reporter, not a single case as of January 2021 would have made it "apparent" to him that his display of a rifle during a virtual meeting focused on the right to bear

arms was an adverse action that would have deterred a person of ordinary firmness from engaging in public comment. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In facing this deficit of case law, MacIntosh primarily invokes *Hope v. Pelzer*, 536 U.S. 730 (2002). *Hope* is not a First Amendment case. It is not a retaliation case. And it does not arise in the vexed setting of this case, in which the alleged retaliatory action is a form of speech itself. *Hope* is an Eighth Amendment case in which the Court said that some cruel and unusual punishments can be "so obvious" that the public official does not need a case to clearly establish the right. *Id.* at 741. But such cases are "rare." *Wesby*, 138 S. Ct. at 590. Else, the clearly established inquiry would come to naught. And MacIntosh does not cite a single such case that arose in the First Amendment arena, in which there can be, indeed often are, two sides to the free speech debate.

Clous's actions, moreover, have no fair-minded parallels to the conduct that occurred in *Hope*. It arose from the handcuffing of a prisoner to a hitching post for hours at a time in the blazing Alabama sun. *Hope*, 536 U.S. at 733–35. Any comparison to Clous's conduct gives comparison a bad name. Tasteless though it was, Clous's action involved a form of symbolic speech, lasted a few seconds, and was offered in response to a demand *from MacIntosh* that he say something about a prior resolution to designate the County as a Second Amendment sanctuary and about the actions of the Proud Boys in other places. No clearly established law in this complicated, multi-view setting showed that this conduct amounted to First Amendment retaliation.

Once it becomes clear that this case is not covered by the "rare" *Hope* exception to qualified immunity, *Wesby*, 138 S. Ct. at 590, that requires MacIntosh to use actual cases involving actual free-speech retaliation. She cannot identify any from the U.S. Supreme Court. She proposes three from our Court: *Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994), *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc), and *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998). The cases do not close this gap.

Start with *Zilich*. A former city council member, George Zilich, became a verbal "thorn" in the mayor's side. 34 F.3d at 360–61. In retaliation for Zilich's advocacy, the mayor and his

supporters discussed injuring Zilich and his family, including "shooting him." *Id.* at 360. The physical threats coincided with vandalism at Zilich's home and on his car and with hostile anonymous phone calls to his home. *Id.* We explained that the mayor "plotted to injure [Zilich] for his political views." *Id.* at 365. And we held that the mayor was not entitled to qualified immunity. "No reasonable official could possibly believe," we reasoned, "that it is constitutionally permissible to retaliate against a political opponent with physical threats, harassment and vandalism." *Id.* Clous's conduct represents a difference in kind and lots of degrees of separation from the mayor's conduct in *Zilich*. Clous's conduct lasted only a few seconds, it was conducted during a virtual meeting, it was undertaken in response to a request for commissioners to make a statement about the Proud Boys and during a discussion of a Second Amendment sanctuary resolution, and it lacked any verbal threats or acts of violent vandalism. Nor was there any "plot[] to injure" MacIntosh. *See id.* How can we say that "any reasonable official in [Clous's] shoes would have understood that he was violating" MacIntosh's First Amendment rights based on *Zilich*? *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

Turn to *Thaddeus-X*. 175 F.3d at 384. Earnest Bell and Thaddeus-X, both Michigan inmates, sued prison officials for retaliating against them for filing a civil complaint. Prison officials allegedly harassed the pair, withheld writing and legal materials, and threatened to "f_ck" Thaddeus-X and move him to an administrative segregation unit with deplorable conditions. *Id.* We reasoned that "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates, especially combined with the conditions allegedly present there, would likely have a strong deterrent effect." *Id.* at 398. The case distinguishes itself. Clous, to repeat, acted virtually for mere seconds and in response to MacIntosh's request.

Turn to *Bloch*. Cynthia and Thomas Bloch sued Sheriff John Ribar, alleging that he held a press conference releasing confidential information about Cynthia's rape in retaliation for the Blochs' public critique of the sheriff's investigation. 156 F.3d at 676. We concluded that Ribar was not entitled to qualified immunity on the First Amendment retaliation claim. We explained that "courts that have considered qualified immunity in the context of a retaliation claim have focused on the retaliatory intent of the defendant." *Id.* at 682. True enough. But *Reichle*

requires us to put a finer point on it. Recall that the arrestee in *Reichle* articulated the right based solely on retaliatory intent, providing a comparably general articulation to this one. 566 U.S. at 665. The Supreme Court rejected that formulation as overly general, instead requiring one that included the allegedly retaliatory and adverse action. *Id.* We must do the same. *Reichle*, indeed, is one of many cases requiring courts to articulate the clearly established inquiry with greater particularity than MacIntosh does here. *E.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018) (per curiam) (Fourth Amendment); *White v. Pauly*, 580 U.S. 73, 79–80 (2017) (per curiam) (same); *Plumhoff*, 572 U.S. at 779 (same). All of which, by the way, postdate our opinions in *Zilich*, *Thaddeus-X*, and *Bloch*. These recent Supreme Court cases hit the same chord—specificity—which requires factoring the adverse action into the clearly established inquiry. *Cf. Occupy Nashville v. Haslam*, 769 F.3d 434, 443–44 (6th Cir. 2014) (defining the right with particularity in First Amendment case).

That this qualified-immunity defense arises at the motion to dismiss stage does not alter this conclusion. When applicable, qualified immunity is designed to avoid trials, litigation, and discovery. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526–27 (6th Cir. 2002). That is why district courts have "a duty to address" qualified immunity "prior to discovery," *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004), and why we must resolve the defense through interlocutory appeals, an exception to the general ban on piecemeal appeals, *Leary v. Livingston County*, 528 F.3d 438, 441 (6th Cir. 2008). The second prong of the defense, the clearly established inquiry, is particularly well suited for resolution at the motion to dismiss stage because it turns only on issues of law, and in this case almost exclusively on a video of the event. *See Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021). That reasoning controls today's case in which the parties, to say nothing of the video of the meeting, are of one mind about the essential and material facts.

One last point. MacIntosh seeks to bolster her retaliation claim by blaming Clous for anonymous threatening phone calls and the Board Chairman's laughter, and alleging that Clous broke the law. R.1 ¶ 52 (citing Mich. Comp. Laws § 750.234e). But without pleading a civil conspiracy—something MacIntosh has not done—there's no basis to attribute any third party wrongdoing to Clous. And MacIntosh does not claim, much less show, that the Michigan law

has been applied in a virtual setting.  And not one of these points thus helps MacIntosh with the clearly established inquiry.

The majority seeing it differently, I respectfully dissent.