NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0418n.06

Case No. 23-5698

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

CARRIE COX; GUY MEADE, )
)
    Plaintiffs-Appellants, )
)
)
v. )
)
)
ANTHONY TODD RUCKEL, et al., )
)
    Defendants-Appellees. )
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

O P I N I O N

Before: THAPAR, NALBANDIAN, and DAVIS, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Carrie Cox and Guy Meade purchased and restored an abandoned property next to the historic Cabin Creek Covered Bridge in Lewis County, Kentucky. Unfortunately, they soon came into conflict with members of the local community over access to the bridge. These conflicts escalated to the point of harassment. Cox told Todd Ruckel, then-Judge Executive of Lewis County, that she intended to raise the bridge-access issues at a meeting of the county fiscal court. Ruckel suggested that the meeting was not the appropriate forum, but Cox persisted and spoke anyway. Cox claims that Ruckel and other defendants engaged in a coordinated campaign of retaliation to punish her for her speech and perceived obstinance regarding the bridge. So she and her husband sued, alleging that the defendants' actions violated the First Amendment. The district court dismissed the claims against the private-citizen

defendants for failure to state a claim. After discovery, the district court granted summary judgment to the public-official defendants based on their qualified immunity. We affirm.

## I.

In March 2017, Cox and Meade were married in a ceremony on the Cabin Creek Covered Bridge. Soon after their marriage, they learned that the property abutting the bridge was for sale. So the couple decided to purchase the lot, fix up the dilapidated home on the property, and move to Lewis County. They purchased the land from Dennis Humphries, who was still the owner of record despite having abandoned the property some years before. At the time of closing, Cox and Meade had not discussed the borders of the property with anyone and had not inspected the boundaries. But the couple was provided with a Property Valuation Administrator (PVA) map, which they understood as outlining their property's borders.

A quick note on the relevant geography. Cabin Creek runs from south to north through Lewis County until it reaches the Ohio River. And the Cabin Creek Covered Bridge spans the river's banks. The home that Cox and Meade purchased is on the western side of Cabin Creek. The old county road that used to cross the creek at the covered bridge passes directly in front of the couple's house. But in 1983, the Commonwealth of Kentucky determined that the century-old covered bridge was no longer suitable for vehicular traffic. So it constructed a new concrete bridge several hundred meters downstream of the covered bridge and realigned Cabin Creek Road to cross the creek at that point. Because the covered bridge was closed to vehicles (though still open to pedestrians), the vestigial spur of the old road that runs in front of Cox and Meade's home stopped functioning as an official road maintained by Lewis County.

But because the property had been abandoned for so long, members of the Lewis County community had grown accustomed to using it to access the covered bridge. And they frequently used the property to fish, swim, and enjoy Cabin Creek in the shadow of the covered bridge, which they saw as part of their heritage.

The opposite side of the covered bridge from Cox and Meade's house had a gravel patch, which visitors used to park. After purchasing the property, Cox spoke with county officials about creating an official parking lot on that gravel patch to limit the number of people driving and parking on the road in front of her house. Cox claims that she talked with Ruckel about allowing visitors to park on the eastern side of the creek in return for the county paying for maintenance and mowing that site. As part of this plan, Cox stated that she planned to "put up a gazebo and create a park-like atmosphere" for visitors that would serve as an alternative to parking in front of her house on the western side of the creek. R.67, Cox Dep., p.36, PageID 1818.

But conflict soon arose over access to the bridge. Cox and Meade became concerned with the amount of traffic on the old road in front of their house. Specifically, Cox objected to the number of cars that were "parked feet from her front door in a rural area." R. 53-14, Dep. Ex. 10, p.2, PageID 982. Though Lewis County still had title to the old road, in 2012 it granted an easement to the Commonwealth (the road easement), granting it use of the road to access the bridge. That agreement explicitly stated that failure to use the roadway to the west of the bridge for two consecutive calendar years would terminate the road easement. But the bridge itself belongs to the Kentucky Department of Parks, which delegates some of its supervisory authority over these landmarks to the Buffalo Trace Covered Bridge Authority.

3

Uncertainty over the status of the road easement plagued Cox and Meade as they renovated their new home. Cox viewed the easement on the road as having terminated, at least on her side of the creek, based on Kentucky's failure to maintain the road. And the county officials agreed—at least at first. Around that time, the Commonwealth requested a new survey of the old access road. Cox claims that Ruckel told her that "they were doing the survey for the purposes of returning the road" in front of the house to Cox and Meade so that they "would have clear title." R.67, Cox Dep., p.39, PageID 1821. And in March 2018, Benjamin Harrison of the Lewis County Attorney's Office advised the Commonwealth that the county viewed the road easement as terminated for lack of use.

No one at the Covered Bridge Authority ever responded to Harrison's letter. And internal communications make it clear that the Authority's members still believed that the road easement was in place. Still, without an acknowledgment that the Authority understood the easement had been terminated, Harrison informed Cox of his belief that "full use and ownership of the road [wa]s with the current landowners—Carrie Cox and Guy Meade." R.53-17, Dep. Ex. 12, p.2, PageID 986.

Even with this letter, Cox and Meade were still apprehensive about trespassing and criminal activity on the bridge. Subscribing to the adage that good fences make good neighbors, Cox and Mead posted a "private property" sign on the entrance to the old road and installed a gate. Lori Ulrich, a member of the Covered Wooden Bridge Authority, became incensed that Cox and Meade were "restricting access and running people out of the bridge after dark." R.53-16, Dep. Ex. 11A, p.1, PageID 984. She contacted Amy Kennedy, the then-director of the Buffalo Trace Area Development District, who concluded that Cox was "up to no good." *Id.* And so the

4

Commonwealth considered legal action against Cox and Meade to ensure road access to the western side of the bridge.

Members of the community also began to resent what they perceived as Cox's attempts to deny access to the bridge. Some formed a Facebook group called the "Troll of Cabin Creek Covered Bridge" accusing Cox of attempting to steal the bridge. From there the exchanges grew more and more acrimonious. Indeed, two individuals—Lisa Bradford and Dianna Malone—eventually faced criminal charges for harassment related to their activities. And Cox and Meade called the county sheriffs many times to report trespassing, though the remoteness of their home meant that trespassers had often left before deputies arrived to verify the complaint. As part of the harassment, someone shot and killed Cox's cat.

In October 2019, the county installed a light pole and trail camera at the bridge because of the concerns about criminal activity. The camera was only accessible to county officials, but members of the community mistakenly believed that Cox and Meade were the ones recording them. So they decided to attend the next meeting of the Lewis County Fiscal Court to "have the camera removed" and "put a stop to this woman trying to control the bridge." R.53-66, Dep. Ex. 54, p.1, PageID 1106. Cox also decided to attend. Because Ruckel, as Lewis County Judge Executive, would preside over the fiscal court, Cox let him know about her intention to speak at the meeting. Ruckel advised against speaking at the meeting because he believed it was more of a "law enforcement issue and not a fiscal court issue." R.54, Ruckel Dep., p.57, PageID 1184. Undeterred, Cox and Meade decided to raise the issue at the next hearing, which happened on October 14, 2019.

At the meeting, Cox spoke on the bridge issue. But the exact content of some of her speech is unclear. Cox and Meade had hired a television crew to record her speech, but they stopped recording right after prepared remarks—thus missing the rest of the meeting. Cox maintains that after her initial speech she offered some other thoughts on how county officials had handled the bridge issue. But the film crew didn't record these parts of her remarks. And before speaking, Cox had passed out informational packets. She also claims that Sheriff Johnny Bivens handed out the PVA map showing that her property extended to the eastern side of the creek.

After that meeting, Ruckel began to work on the bridge problem in earnest. He believed that the county had an agreement with Melvin Hughes, a property owner on the eastern side of Cabin Creek, to use some property on the eastern end of the bridge (the parking easement) as a parking and public access area in exchange for mowing and maintaining it. Despite his belief in the preexisting arrangement, Ruckel could not locate any signed agreement granting the county such an easement. But a 2007 survey by the county surveyor suggested that the area to the east of the bridge was subject to a parking easement from Hughes. To make it official, Ruckel asked Harrison to draft a new parking easement. And because he did not know Hughes well, he asked his friend Jonathan Shane Wallingford to accompany him when he went to ask Hughes for the parking easement. So Ruckel and Wallingford went to Hughes' home and had him execute the newly drafted parking easement.

On October 21, Ruckel sent a text message to Cox notifying her that his entire "last week after fiscal court ha[d] been filled with this covered bridge issue." R.53-33, Dep. Ex. 26, p.1, PageID 1014. He noted that the 2007 survey showed that Cox and Meade's "property goes to the middle of the creek" while the eastern side of the creek was owned by Hughes and the Commonwealth of Kentucky. *Id.* He also stated that "[t]he county has an easement on Hughes's

6

property," though he failed to mention that the parking easement was only a week old. *Id.* And finally he notified Cox that the local newspaper, the Lewis County Herald, "ha[d] all this info" and that it would appear in the paper that week. *Id.* He closed the message by stating that he "want[ed] the facts out there and people will know now." *Id.* But he invited her to call him, noting that he had "a little time this morning before meetings if [she] want[ed] to talk." *Id.* Cox alleges that when she called Ruckel he told her to not dispute what was in the newspaper article or else "he would open the road in front of [her] house." R.67, Cox Dep., pp.73–74, PageID 1855–56.

As promised, the Lewis County Herald ran the article. It quoted Ruckel as saying that he wanted to balance the right of the people to access the bridge with Cox and Meade's privacy interest. Based on the 2007 survey, he stated that Cox and Meade did not own both banks on either side of the bridge because their property line extended only to the middle of Cabin Creek. He noted that the county had a parking easement on the eastern side of the bridge for parking so visitors "can access the creek." R.51-15, Mot. for Summ. J. Ex. G, p.1, PageID 921. But notably, the article did not mention whether the public could access the part of the old road that runs in front of Cox and Meade's house.

The Lewis County Herald then printed an op-ed written by Wallingford, supporting Ruckel's position. The op-ed emphasized that the PVA map that Cox and Meade had shown at the meeting was not "legal or binding in any way, shape or form" before affirming that the county had a parking easement. R.53-29, Dep. Ex. 23, p.1, PageID 1000. And Wallingford castigated Cox and Meade for "calling law enforcement officials to report trespassing on private property that did not even belong to them." *Id.* He then accused the couple of making their complaints in bad faith, harassing "those who chose to visit our local, refurbished, historic landmark." *Id.* And

7

the op-ed concluded by praising Ruckel for addressing the bridge issue "head-on" using "facts from reliable sources." *Id.*

After the article and op-ed were released, Malone added a celebratory post on the Troll of Cabin Creek Facebook page. Her post concluded with the following rather cryptic remark:

> I know everyone was pissed at Todd Ruckel and so was [I]. But after [I] was told what was going on and what they was doing [I] backed off. I couldn[']t say anything so that[']s why [I] posted what [I] did. Todd is on our side believe me and [I] want to also thank Shane Wallingford and the others.

R.53-75, Dep. Ex. 63, p.1, PageID 1115. In response to the article and the reaction it garnered online, Cox contacted Harrison, who stated that he "couldn't believe that shit was in the paper." R.53-36, Dep. Ex. 28A, p.1, PageID 1023. And Cox alleges that Harrison told her that she had "a very good case for first amendment rights retaliation because all of these things have transpired." R.67, Cox Dep., p.72, PageID 1854.

The location of the parking easement quickly became a source of friction between the homeowners and the county because the exact ownership of the land encumbered by the easement was disputed. As part of the conflict over the parking easement, Cox commissioned Cahill Surveyors to survey her and Meade's property. Cox alleges that this survey found that the property line went over the creek and that it matched the 1891 survey and PVA map of their property. And so she maintains that she and Meade own the land on which the disputed parking easement lies.

Cox also claimed that the county's parking easement lies on property that *she*—rather than Hughes—allowed the county to mow in return for use as a parking lot. Yet Ruckel stated that he didn't know why the county would have such an agreement with Cox because he always understood the land to belong to Hughes as shown by the 2007 survey. But Cox alleges that the 2017 survey conducted by the Commonwealth had "uncovered problems" with the 2007 survey, making Ruckel's reliance on it unreasonable. R.67, Cox Dep., pp.38–39, PageID 1820–21.

She claims that Jean Bird, a lawyer with the Commonwealth, had told her as much and that both Ruckel and Harrison knew about this conversation. Ruckel and Harrison each deny that they learned of any potential problems with the 2007 survey.

Less than two weeks after this survey, the Lewis County Fiscal Court petitioned to quiet title to the area of the parking easement. The fiscal court added the Kentucky Tourism, Arts, and Heritage Cabinet's Department of Parks as a defendant because it "may be claiming an interest to property located adjacent to" the area covered by the petition. R.53-48, Dep. Ex. 37, p.4, PageID 1044. Eventually, the Lewis County Circuit Court granted the Parks Department summary judgment and confirmed the property interest in the old road in front of Cox and Meade's home. And the Kentucky Court of Appeals affirmed. *See Cox v. Commonwealth*, No. 2022-CA-1068, 2023 Ky. App. Unpub. Lexis 701, at *14 (Ky. Ct. App. Dec. 1, 2023).

At the same time Cox and Meade were experiencing a redoubled harassment campaign by members of the community who felt that the couple was trying to steal the bridge. The couple called the police more than fifty times since the start of 2020. Cox thought her primary antagonists were Dianna Malone and Terri Thomas, one of the Lewis County Magistrates.

In October 2020, Cox and Meade sued Ruckel, Thomas, Wallingford, Kennedy, the Malones, and an assortment of John Does for First Amendment retaliation and conspiracy to deny them their civil rights. Wallingford and the Malones moved to be dismissed for failure to state a claim. The district court granted both motions, holding that the complaint included insufficient factual allegations to show that "Wallingford and the Malones acted in concert with state officials to retaliate against [them]." R.23, Op. & Order, p.8, PageID 181.

After discovery, Ruckel, Thomas, and Kennedy moved for summary judgment. So Cox and Meade filed their own motion for partial summary judgment. In support, Cox and Meade introduced a declaration from Meade about certain statements that Cox allegedly made at the fiscal court meeting. Ruckel and the other defendants moved to strike Meade's declaration under the sham affidavit rule. The district court granted the defendants' motion for summary judgment, finding them entitled to qualified immunity; it also struck Meade's declaration under the sham affidavit rule. So Cox and Meade appealed both the grant of summary judgment[1] and the earlier dismissal of their claims against Wallingford.

## II.

Begin with the conspiracy claim against Wallingford. We review a dismissal for failure to state a claim de novo. *Smith v. Gen. Motors LLC*, 988 F.3d 873, 877 (6th Cir. 2021). In doing so, we view the complaint in the light most favorable to the non-moving party and accept all well-pleaded factual allegations as true. *Id.*

Cox and Meade claim that Wallingford conspired with public officials to retaliate against them for speaking at the fiscal court meeting. The complaint's key allegations against Wallingford were that he (1) attended the fiscal court hearing and (2) wrote an op-ed in the local newspaper on the covered-bridge issue that favored Ruckel. Determining that both actions implicated Wallingford's own First Amendment rights, the district court dismissed the conspiracy claim against him because his protected actions couldn't be the basis of a § 1983 claim. Although we disagree with this precise reasoning, we affirm the district court's larger holding that the complaint failed to provide sufficient facts to make the conspiracy claim against Wallingford plausible.

---

[1] Cox and Meade do not appeal the grant of summary judgment as to their claims against Amy Kennedy.

**A.**

Private citizens like Wallingford may be sued under 42 U.S.C. § 1983 if they "conspired with state officials to violate constitutional rights." *Cooper v. Parrish*, 203 F.3d 937, 952 n.2 (6th Cir. 2000). Our circuit applies a simple test for both civil and criminal conspiracies. *Rudd v. City of Norton Shores*, 977 F.3d 503, 517 (6th Cir. 2020). A plaintiff must show (1) the existence of a "single plan," (2) a "general conspiratorial objective" shared among the defendants, and (3) the commission of an overt act in furtherance of the conspiracy that caused the complained-of injury. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). The essence of the conspiracy is the agreement to commit an unlawful act. *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). So long as this element is present, there is "no requirement that the defendant himself commit the overt act." *See United States v. Fox*, 134 F.4th 348, 370 (6th Cir. 2025) (per curiam) (quoting *United States v. Bradley*, 917 F.3d 493, 505 (6th Cir. 2019)). And any individual who joins the conspiracy can be held liable even if they didn't commit an overt act. *Id.*

On appeal, Wallingford argues that the only substantive allegations directed against him involved conduct protected by the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine developed from antitrust law to balance the statutory prohibitions of the Sherman Act with the constitutional protection of the right to petition. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139–40 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Despite its origins in antitrust law, we have held that "[t]he doctrine immunizes parties from liability under antitrust laws or § 1983 for actions taken when petitioning authorities to take official action." *Knology, Inc. v. Insight Commc'ns Co.*, 393 F.3d 656, 658 (6th Cir. 2004). And "petitioning authorities to take official action" is protected under the First Amendment "even

where the petitioning activity has the intent or effect of depriving another of property interests." *Id.*

Both of Wallingford's alleged actions—attending the fiscal court meeting and publishing the op-ed—can be understood as either protected speech or petitioning the government for official action. Wallingford "cannot be held liable for [these] actions" because they "were protected by the first amendment rights to speak freely and to petition the government." *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 299 (6th Cir. 1992). And the complaint does not allege that these actions were merely a "sham" for intentional harassment. *Id.* at 298 (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)). So neither of the alleged actions can qualify as overt actions in furtherance of the conspiracy because that would amount to imposing liability for a constitutionally protected action. After all, § 1983's private right of action does not penalize speech otherwise protected by the First Amendment.

Yet that is not the end of the inquiry. Even if Wallingford's speech deserves First Amendment protection, that by itself doesn't mean that the conspiracy claim against him must be dismissed. The complaint claims that Wallingford was a part of a conspiracy where several other overt acts were alleged—acts that were not challenged in the motion to dismiss. That neither of Wallingford's own actions constituted an overt act for the conspiracy does not mean he cannot be held liable for a conspiracy. Even though the First Amendment prevents liability from directly attaching to the protected speech, these lawful actions could "plausibly raise an inference of unlawful agreement." *See Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012). So the question is not whether Wallingford individually committed any overt act, but whether he joined the alleged conspiratorial agreement to unlawfully retaliate against Cox and Meade for their

speech. And the success—or failure—of this claim hinges on whether the complaint plausibly alleges Wallingford's participation in the conspiratorial agreement.

**B.**

And so we address the plausibility of the conspiracy claim. To survive a motion to dismiss, a complaint must "state a 'claim to relief that is plausible on its face.'" *Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1037 (6th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To have facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But pleading "facts that are merely consistent with a defendant's liability" isn't enough to nudge a complaint across "the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678). More is required.

In reviewing a previously dismissed claim, we limit our review to "the complaint itself," because we "cannot decide that a complaint was worthy of proceeding to discovery against one party by considering evidence uncovered during discovery against another." *Agema v. City of Allegan*, 826 F.3d 326, 332 (6th Cir. 2016). After all, "a district court may not consider matters beyond the complaint" in reviewing a motion to dismiss. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). And it would be an odd inversion indeed if this court could second-guess the correctness of the district court's dismissal using evidence that we specifically instructed that court not to consult. So the conspiracy claim rises or falls based on the factual allegations contained in the complaint—nothing more.

Recall that any complaint claiming civil conspiracy must plead (1) the existence of a single plan, (2) a general conspiratorial objective shared among the defendants, and (3) the commission of an overt act in furtherance of the conspiracy that caused the complained-of injury. *Hooks*, 771 F.2d at 944. This court has noted that "allegations alone, even if conclusory or improbable" may be sufficient to plead a conspiracy at "this early stage of litigation." *Novak v. City of Parma*, 932 F.3d 421, 436 (6th Cir. 2019). So the mere fact that the "defendant's briefing identifies a 'more likely alternative explanation[]' for what occurred" doesn't render a conspiracy claim implausible. *Rudd*, 977 F.3d at 517 (alteration in original) (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013)). Still, the complaint must allege the conspiracy with "specificity" to survive a motion to dismiss. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). Allegations of parallel conduct, without the connective tissue of a conspiracy, will not suffice.

Under this standard, Cox and Meade's complaint falls short. Yes, they meet the requirements of the conspiracy test as to some alleged conspirators not including Wallingford. First, their complaint alleges a specific plan—to retaliate against Cox and Meade for their speech at the fiscal court meeting. And second, the complaint alleges several overt acts taken in furtherance of the conspiracy—which Wallingford didn't challenge in his motion to dismiss. So if Cox and Meade could allege that Wallingford had "joined in the conspiracy's objectives," they would have pleaded a plausible claim to relief. *Rudd*, 977 F.3d at 518. But it is on the third prong that the complaint stumbles.

As Wallingford points out, he is strangely absent from Cox and Meade's allegations of a wide-ranging conspiracy in Lewis County. Indeed, beyond the conclusory allegation that Wallingford was a part of the conspiratorial agreement, the complaint's only allegations are that

14

(1) he was good friends with Ruckel, (2) he became infuriated at Cox and Meade after hearing their speech at the fiscal court meeting, and (3) he published an op-ed in the Lewis County Herald "praising Ruckel and casting aspersions on" Cox and Meade. R.1, Compl., p.7–8, PageID 7–8. That's it.

These allegations don't allow the reasonable inference that Wallingford joined the alleged conspiratorial agreement to retaliate against Cox and Meade. That Ruckel was friends with Wallingford isn't enough because "mere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Hughes*, 505 F.3d 578, 588 (6th Cir. 2007) (quoting *United States v. Pearce*, 913 F.2d 159, 162 (6th Cir. 1990)). Neither is his attendance at the fiscal court meeting, nor his publication of the op-ed. These allegations fail not because of the First Amendment protection for Wallingford's speech, but because they aren't enough to allow a reasonable inference of his joining the conspiratorial agreement.

Although speech protected by the First Amendment cannot give rise to liability under § 1983, it can provide factual support for the allegation that the speaker was part of a conspiracy. Because "it is the agreement which forms the nucleus of the offense" in conspiracy cases, the constitutionally protected speech provides evidence of the crime rather than being the crime itself. *United States v. Xu*, 114 F.4th 829, 840 (6th Cir. 2024) (quoting *United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983)). So the fact that the Constitution bars direct liability for protected speech doesn't mean that such speech couldn't support a reasonable inference that the speaker harbored the requisite conspiratorial intent.

But here, the complaint never alleges more than the remote possibility that Wallingford's actions demonstrate a conspiratorial agreement.[2] To borrow a phrase from antitrust law, the complaint merely lists parallel conduct rather than showing any cooperation or shared objective between Wallingford and the alleged co-conspirators. Such "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. And though an allegation of conspiracy doesn't fail just because the defendants can point to a more likely alternative explanation, Cox and Meade must still allege enough supporting facts to move the claim from the realm of the possible to that of the plausible. *Id.* Cox and Meade's barebones complaint doesn't meet this burden. The district court didn't err in dismissing the conspiracy claim against Wallingford.

## III.

Cox and Meade also challenge—both directly and indirectly—the district court's grant of summary judgment to Ruckel and Thomas. First, they claim that the district court erred in rejecting Meade's last-minute declaration as an attempt to create a sham fact issue. Second, they argue that they were entitled to a remedial presumption based on Ruckel's spoliation of his county email. And third, they assert that the district court erred in granting summary judgment to Ruckel and Thomas on this record. The first two points attack the grant of summary judgment indirectly by

---

[2] Subsequent evidence indicates that Wallingford helped Ruckel get the easement—one of the actions that Cox and Meade complained of as retaliatory. But, as discussed, this after-acquired evidence from discovery conducted against other parties cannot impact the plausibility of the conspiracy claim as pleaded in the complaint. The complaint itself needed to provide sufficient factual allegations of Wallingford's involvement with Meade in order to pass the initial hurdle of a motion to dismiss. We recognize the difficulty of pleading a conspiracy with specificity due to their clandestine nature. But that difficulty alone is not enough to relax the requirement that the plaintiffs plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

undermining key points of the district court's decision. The third directly challenges the district court's application of the summary judgment standard. Since the first two logically precede the summary judgment determination, we address them first.

## A.

The sham fact rule embodies the common-sense conclusion that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Otherwise, any party could defeat summary judgment by submitting an affidavit contradicting their own prior testimony, which "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *See France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (internal quotation marks omitted); *see also* 11 James W. Moore et al., *Moore's Federal Practice* § 56.94[5][a] (3d ed. 2017) (noting that the rule "is considered necessary to preserve the utility of the summary judgment procedure, preventing parties from routinely raising 'sham' factual disputes by merely submitting affidavits or declarations contradicting other testimony"); 10A Arthur R. Miller et al., *Federal Practice and Procedure* § 2726.1 (3d ed. 2004) (noting that "the nonmoving party should not be allowed to manufacture a question of fact to delay resolution of the suit").

So an affidavit that's "directly contradictory" to the affiant's prior sworn testimony should be struck by the court unless he can provide "a persuasive justification for the contradiction." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). But contradictions in this context are construed "narrowly." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 501 (6th Cir. 2021). After all, deponents are not required to "volunteer information" or answer questions they've never been asked. *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019).

And yet, even if the affidavit is not directly contradictory to the deposition, the rule may still "apply when the witness's affidavit is in tension with that prior testimony." *Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842 (6th Cir. 2021). In that situation, the key question is whether "the circumstances show that the party filed the affidavit merely to manufacture a 'sham fact issue.'" *Id.* (quoting *Aerel*, 448 F.3d at 908). We often approach this question by examining (1) whether the affiant was cross-examined during his prior sworn testimony, (2) whether the affidavit is based on newly discovered evidence or information that the affiant had access to at the time of his prior testimony, and (3) whether the affidavit merely represents an attempt to clarify a point of confusion in the prior testimony. *Johnson*, 13 F.4th at 501 n.6. But these factors are "nonexhaustive." *Aerel*, 448 F.3d at 908. So we may consider other facts, too.

Cox and Meade filed Meade's declaration as an attachment to their response to the defendants' summary judgment motion. The declaration states that, after the film crew had stopped taping the meeting, Wallingford and Malone "again raised the issue of the bridge and indicated that they thought that the county had been maintaining the area on the other side of the bridge." R.69-1, Meade Decl., p.2, PageID 1991. Meade maintained that Cox "respond[ed] to their comments by again stating that [Cox and Meade] owned the land, and . . . publicly object[ing] to any additional expenditure of public funds being used to mow or maintain that space." *Id.* But in his deposition, Meade had not testified about this untaped interaction between Cox, Wallingford, and Malone. At one point he was questioned if he "address[ed] any of the concerns about public money being used for on (sic) private property at that meeting." R.70, Reply to Resp., p.3, PageID 1998 (second modification in original). But Meade responded that a recent traumatic brain injury from a car wreck prevented him from "hav[ing] details like that." *Id.*

18

Because Meade did not testify about whether his wife raised the issue at the fiscal court meeting, his subsequent declaration isn't directly contradictory. So the key question is whether, by filing this declaration, Meade attempted to create a sham fact issue and frustrate the summary judgment motion.

Unfortunately, the three-factor test does little to resolve the issue. Neither party put Meade's deposition in the record. And we do not know whether he was cross-examined—though it seems likely that there would have been an opportunity to do so. *See* Fed. R. Civ. P. 30(c)(1). Thus, the first factor is inconclusive.[3] On the second, Meade's declaration is not based on newly discovered information. It is based on information that he claims he could not remember at the time of his original testimony because of his traumatic brain injury. But even accepting this as true, we're left questioning why Meade waited until after the defendants moved for summary judgment to divulge this information. So the second factor weighs against Meade. And on the third factor, Meade's declaration seems to be trying to add new testimony rather than clarify some

---

[3] Granted, the cases are less than clear on how this first factor applies. In the context of depositions, the terminology of examination and cross-examination can be confusing. Under Federal Rule of Civil Procedure 30(b)(1), the "party who wants to depose a person by oral questions" gives notice. The noticing party's attorney then conducts the initial round of questioning of the witness—called the examination. The opposing attorney then can cross-examine the witness. Fed. R. Civ. P. 30(c)(1). But the cases are unclear whether the test is that the witness was cross-examined on the specific issue in the declaration or whether they were cross-examined at all at the deposition. *Compare France v. Lucas*, 836 F.3d 612, 624 (6th Cir. 2016) (noting that the witness "was cross-examined during his earlier testimony" (internal quotation marks omitted)), *with Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364 (8th Cir. 1983) (noting that the witness "was cross-examined at length on the subject during the earlier deposition"). This comes down to whether the test is about the opportunity to ask clarifying questions or whether such clarifying questions were asked and proved insufficient. We note that the latter interpretation does expose the rule to some gamesmanship since an attorney might make the strategic choice to waive cross-examination and choose instead to introduce declarations at the last minute to frustrate summary judgment. But since we lack the full deposition transcript, we have no occasion to resolve this question of application.

confusion in his deposition responses. But it runs into the same question of timing—namely, why Meade held this information back until a motion for summary judgment had been filed. As a result, this factor is also inconclusive.

So on the whole, the three-factor test doesn't determine the outcome here. But since these factors aren't meant to be exhaustive, we don't stop there. Indeed, the most persuasive feature here is the fact that Meade is offering this testimony rather than Cox herself. After all, this declaration is about whether Cox spoke about misusing public funds at the fiscal court meeting. So presumably she would be the best witness to clarify whether such a conversation took place. But in her own deposition, Cox repeatedly refused to testify that she had raised this issue after the video crew had stopped recording the meeting, saying only: "I don't recall." R.67, Cox Dep. Tr., pp.64–65, PageID 1846–47. So it seems that Meade is being used as a stalking horse to put forward a declaration because Cox couldn't without creating a sham fact issue herself.[4]

As the district court noted, it's "telling that Cox, who allegedly made the statement, was unable to remember whether she commented on the county's alleged misuse of funds . . . , while Meade, who sustained a traumatic brain injury and conceded having memory problems, recalled that she did so." *Cox v. Ruckel*, No. 0:20-120, 2023 WL 4422849, at *10 (E.D. Ky. July 10, 2023). So given the circumstances of this declaration, it wasn't an abuse of discretion for the district court to strike it.

---

[4] Though Cox's statements might not be directly contradictory, they would almost certainly fail the sham fact issue test outlined above. Cox was not cross examined at her own deposition, so the first factor wouldn't count against her. But the remaining two factors would. Since the declaration would be about her own actions at the meeting, she would have had access to this information at the time of her earlier deposition. That is—it wouldn't be based on newly discovered information. And Cox couldn't cast this declaration as an attempt to clarify an ambiguity or misstatement in her earlier testimony. So Cox couldn't have offered a declaration like the one Meade did.

**B.**

The next preliminary issue is whether the district court erred in holding that the spoliation of Ruckel's county email address required an adverse-inference instruction and created a genuine dispute of material fact that would preclude summary judgment. This court reviews the district court's denial of remedies for the spoliation of evidence for an abuse of discretion. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 285 (6th Cir. 2020). As part of this review, we "acknowledge the district court's broad discretion in crafting a proper sanction for spoliation." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc).

The party requesting a spoliation sanction must show that (1) the individual who controlled the evidence had "an obligation to preserve it at the time it was destroyed," (2) the destruction was done "with a culpable state of mind," and (3) the evidence destroyed was such that a "reasonable trier of fact could find that it would support [the adversely affected party's] claim or defense." *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1070 (6th Cir. 2014) (quoting *Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010)). Among the sanctions that a district court can impose for spoliation are (1) dismissal of the case, (2) summary judgment, or (3) a jury instruction of a negative inference against the party at fault. *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014). But the "severity" of the sanction imposed varies based on the culpability of the party responsible for destruction. *Yoder*, 774 F.3d at 1070. And, in some cases, spoliation sanctions are appropriate for even negligent conduct. *Beaven*, 622 F.3d at 554.

While the district court has latitude in determining what form a spoliation sanction should take, Federal Rule of Civil Procedure 37(e) provides some guidance for unrecoverable electronic information. The rule distinguishes between negligent and intentional spoliation. If electronic

evidence "is lost because a party failed to take reasonable steps to preserve it" the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). But the more serious sanctions—such as a negative inference—are appropriate "only upon [a] finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

Cox and Meade's counsel had notified Ruckel of his obligation to preserve "any and all evidence" related to the pending suit on June 25, 2020. R.53-44, Dep. Ex. 35, pp.4–5, PageID 1036–37. But when Ruckel left his position as the Judge Executive of Lewis County, he took no steps to preserve his county email.

In considering the spoliation claim for this email data, the district court ran through the Rule 37(e) analysis and determined that "remedial action would result in an unwarranted windfall to the plaintiffs." *Cox*, 2023 WL 4422849, at *10. Cox and Meade requested "a rebuttable presumption that the evidence in question is to be presumed to be inculpatory." R.69, Mem. in Opp'n to Mot. to Dismiss, p.11, PageID 1975. But the district court appropriately determined that, though Ruckel may have been negligent in failing to ensure the preservation of his county email, there was no indication in the record that he or any of the other defendants intended to destroy the information to prevent its use in litigation. And the more severe sanction that Cox and Meade had requested wasn't appropriate under Rule 37(e). So declining to award the couple's preferred sanction was not an abuse of discretion.

## C.

Having resolved these preliminary issues, we turn to the heart of the matter—whether the district court erred in granting summary judgment based on Ruckel and Thomas's qualified immunity. In doing so, we review the district court's grant of summary judgment de novo. *Capen*

22

*v. Saginaw Cnty.*, 103 F.4th 457, 461 (6th Cir. 2024). Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Here the main question is whether Ruckel and Thomas are entitled to summary judgment on the First Amendment retaliation claim. To succeed on a First Amendment retaliation claim, a plaintiff must show that (1) he "engaged in protected conduct," (2) the defendant took "an adverse action . . . that would deter a person of ordinary firmness from continuing to engage in that conduct," and (3) the adverse action "was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (per curiam). While these factors remain constant, a court's determination of "whether activity is 'protected' or an action is 'adverse' will depend on context." *Id.* at 388.

But even if a plaintiff demonstrates these elements of First Amendment retaliation, qualified immunity may still bar suit if the law was not clearly established. Qualified immunity protects government officials from suit provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The limited nature of this doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly" with "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity inquiry has two prongs. First, we ask whether the facts, "when taken in the light most favorable to the party asserting the injury, show the offic[ial]'s conduct violated" a statutory or constitutional right. *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). Second, we ask whether, at the time of the violation, the right was clearly established "such 'that

a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting

*Saucier v. Katz*, 533 U.S. 194, 202 (2001)). We may address these prongs in the order of our

choosing. *Pearson*, 555 U.S. at 236. And once the doctrine has been invoked, the plaintiff bears

the burden of proving that the defendant is not entitled to qualified immunity. *Baker v. City of*

*Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006). Because Ruckel and Thomas both assert qualified

immunity, we consider each official's entitlement to such immunity separately. *Smith v. City of*

*Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam).

We start with the protected conduct requirement. Cox and Meade have shown that Cox

spoke at the fiscal court meeting—a protected activity.[5] Speaking with a public official, especially

in a public forum, can "implicate both the freedom to petition and the freedom of speech." *Rudd*,

977 F.3d at 513; *see also Holzemer v. City of Memphis*, 621 F.3d 512, 520 n.2 (6th Cir. 2010)

(noting that a conversation with a government official can amount to petitioning activity even

when the request is not reduced to writing). As a result, Cox and Meade can likely meet the first

requirement of showing that they engaged in protected conduct.

---

[5] The parties debate whether Cox's speech at the fiscal court meeting amounted to protected speech because it touched on a matter of public concern. But when the plaintiff is a private citizen, we don't require a showing that the speech or protected conduct touched upon matters of public concern because that requirement is limited to the context of "public employment, where free speech rights must be balanced against the need to effectively manage a governmental entity." *Jenkins v. Rock Hill Loc. Sch. Dist.*, 513 F.3d 580, 586–87 (6th Cir. 2008). Obviously, the Meade affidavit would make it easier for Cox and Meade to meet this first requirement because it could show that the couple engaged in clearly protected conduct by criticizing a public employee. But as discussed, the district court didn't abuse its discretion in excluding that declaration. Still it seems likely that the couple's speech at the fiscal court meeting is protected conduct even if they leveled no criticism against Ruckel or Lewis County government. But since Cox and Meade's claim fails on the second requirement of adverse action, we only assume without deciding that it meets the first requirement of showing that they engaged in protected conduct.

But their First Amendment claims stumble on the second requirement because they cannot show that either defendant engaged in an adverse action. Recognizing this fact, Cox and Meade suggest that this court's qualified-immunity inquiry "extends *only* to the protected conduct/speech . . . because it is clearly established that public officials cannot retaliate against citizens for engaging in such speech." Appellant Br. at 34 (emphasis modified). Not so. Their suggestion mistakenly defines the protected right "at too high a level of generality." *Finley v. Huss*, 102 F.4th 789, 808 (6th Cir. 2024) (citing *White v. Pauly*, 580 U.S. 73, 79 (2017)). And our caselaw makes clear that the "salient question" is whether "the state of the law" provides "fair warning" to the defendants that specific actions might be unconstitutional. *MacIntosh v. Clous*, 69 F.4th 309, 319 (6th Cir. 2023) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). So we avoid defining the protected right in a way that would convert "a guarantee of immunity into a rule of pleading." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). And we review whether any of the claimed adverse actions amount to a constitutional violation as part of our qualified immunity inquiry.

Applying this standard, we find that both Ruckel and Thomas are entitled to qualified immunity. Of course, Cox and Meade have the right to speak freely without fear of harassment or retaliation by public officials. But even viewed in the light most favorable to Cox and Meade, the record doesn't support the claim that Ruckel or Thomas violated a clearly established constitutional right.[6]

---

[6] Because we determine that none of the alleged adverse actions are sufficient to go to a jury, we don't address whether Cox and Meade could show that any of the alleged adverse actions were prompted by the couple's protected conduct.

25

**1.**

The complaint alleges that Ruckel retaliated against Cox and Meade by obtaining the parking easement over property that they claimed, participating in the harassment campaign, threatening to open the road in front of their house, and filing the quiet title action against the couple. So we address whether any of the claimed adverse actions by Ruckel violated Cox and Meade's clearly established constitutional rights.

*a.*

Begin with the claim that obtaining the parking easement over land claimed by Cox and Meade was a constitutional violation. The factual allegations indicate that Ruckel was operating under a reasonable belief that the land belonged to Melvin Hughes and that he was merely formalizing an agreement that pre-existed his tenure as Judge Executive. Ruckel relied on the borders established in the 2007 survey to try and achieve a compromise that would give Cox and Meade privacy while also allowing others to visit the bridge. And the record does not support the inference that Ruckel knew that Cox believed the property subject to the easement belonged to her. So even construing the record in the light most favorable to the nonmoving party, Ruckel's acquisition of the easement from Hughes could not amount to an adverse action.

But even if Cox and Meade could show that the easement was an adverse action retaliating against the couple's speech, such a constitutional violation wouldn't be clearly established. Resisting this conclusion, the couple claims that this court's caselaw "establish[es] that interference or restriction of property rights in land is sufficient adverse action for a First Amendment retaliation case." Appellant Br. at 41. They cite two cases to support this proposition: *Fakhoury v. O'Reilly*, 837 F. App'x 333 (6th Cir. 2020), and *Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010). But neither is sufficient to show that the easement

deprived them of a clearly established constitutional right. *Fakhoury* is an unpublished case which could not establish the law even if it stood for the proposition that Cox and Meade ascribe to it. *See Brown v. Giles*, 95 F.4th 436, 439 (6th Cir. 2024). And *Fritz* merely puts officials on notice that the denial of zoning and signage variances in retaliation for protected speech violates the Constitution. 592 F.3d at 728–29. That holding didn't give officials notice that any retaliatory interference with property rights—or claimed property rights—violated the Constitution. So even if securing the parking easement was a constitutional violation, it couldn't be clearly established.

*b.*

Likewise, Ruckel's release of information about the parking easement in the newspaper didn't rise to the level of harassment that violated the Constitution. To avoid this conclusion, Cox and Meade argue that it is clearly established that harassment and defamatory statements retaliating against speech can violate the Constitution. This is true but irrelevant. Ruckel's comments about the easement's existence and his clarification of the property boundaries "were not highly embarrassing nor did they impugn [Cox and Meade's] character." *Id.* at 727. Our caselaw makes clear that the bar for defamatory statements in the First Amendment retaliation context is high. *Id.* And so the Lewis County Herald article was "not of such a character" to be defamatory or harassing in the constitutional sense. *Id.* The statements provided to the paper merely confirmed the property lines as shown in the 2007 survey before noting that the county had acquired a parking easement for public use on the opposite side of the creek from Cox and Meade. This didn't amount to a campaign of harassment or intimidation against the couple, though they may have disagreed with the article's contents. *See Thaddeus-X*, 175 F.3d at 398–99. So releasing this information wasn't a constitutional violation.

27

*c.*

Nor was the claimed threat to open the road in front of the couple's house. Cox testified that Ruckel warned her that continued resistance on the bridge issue might result in the road in front of her house being opened to the public. And the Lewis County Fiscal Court, under Ruckel's direction, did initiate the quiet title suit that had the effect of doing exactly that. So Cox characterizes her conversation with Ruckel as a threat made in retaliation for her speech at the fiscal court meeting. But even if Ruckel made such a statement in response to Cox's speech at the meeting, this wouldn't violate the Constitution. While we have held that an official's threatening behavior in response to speech can violate the Constitution, we generally limit this to "physical threats" of violence that are clearly beyond the bounds of what a public official may do. *See MacIntosh*, 69 F.4th at 316 (quoting *Thaddeus-X*, 175 F.3d at 398); *see also Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994) ("No reasonable official could possibly believe that it is constitutionally permissible to retaliate against a political opponent with physical threats. . . ."). And where we have recognized non-physical threats, they tended to be especially serious threats to a person's "economic livelihood." *Fritz*, 592 F.3d at 728.

The limitation of threats to those of physical violence or severe economic devastation stems from the need "to ensure that real injury is involved, lest we 'trivialize the First Amendment.'" *See Mezibov v. Allen*, 411 F.3d 712, 721 (6th Cir. 2005) (quoting *Thaddeus-X*, 175 F.3d at 397). Cox and Meade have provided evidence that they valued keeping the road in front of their house closed to the public. And they claim that they had reasonable fears of violence if it was opened to the public—due in part to the acrimony caused by the covered bridge debate. But Ruckel himself did not threaten physical violence against them. And physical violence was not the natural and foreseeable result of opening the road. Nor would opening the bridge cause Cox and Meade severe

economic hardship. So even if Ruckel said what Cox claims he did, it's likely a bridge too far to say that amounted to a constitutional violation.

Regardless, even if the alleged threat violated the Constitution, it wouldn't be clearly established. That is, an official in Ruckel's position wouldn't have known he was acting unconstitutionally. A reasonable official could have understood their statement as providing Cox and Meade with the proverbial carrot and stick—if you go along with my proposed compromise you get to keep your driveway private, but if you continue to stir the pot and get the state officials involved you might lose that. And nothing in our caselaw would put that official on notice that, under the circumstances presented here, such conduct was violating a clearly established right.

*d.*

Finally, Ruckel didn't violate clearly established law by asking the fiscal court to file a lawsuit in state court. There was a genuine dispute over who owned the property that the county claimed the parking easement in—a dispute that was made even worse because each side had conflicting surveys. In this confusion, Harrison had notified Cox that these intractable land disputes often required court involvement, and that the county was prepared to "litigate the matter if sued or bring our own action" if the surveyors couldn't reconcile the property lines. R.53-47, Dep. Ex. 36B, p.1, PageID 1040. Ruckel's participation in the fiscal court's vote to sue Cox and Meade was part of his normal duties as Judge Executive. After all, "it is not a tort for government to govern"—a principle that extends to public officials who are charged with making tough choices that might impact the rights and interests of others. *See Scheuer v. Rhodes*, 416 U.S. 232, 241 (1974) (internal quotation marks omitted).[7]

---

[7] Indeed, Ruckel's own First Amendment rights might also prevent this lawsuit from being an adverse action. Recall that the *Noerr-Pennington* doctrine immunizes a party from § 1983 liability for petitioning the government, "even where the petitioning activity has the intent or effect of

But even if Cox and Meade can show that the lawsuit was adverse action, they can't show that it violated clearly established law. Resisting this conclusion, Cox and Meade point to *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014), as establishing that filing a lawsuit constitutes an adverse action in the context of First Amendment retaliation. But the facts of that case make it a poor vehicle for establishing such a general rule. There, a university filed a lawsuit seeking to recover sabbatical compensation from a professor, allegedly for retaliatory purposes. We held that "[a] reasonable individual might have been dissuaded from engaging in protected conduct by the threat of a lawsuit holding her liable for more than $50,000." *Id.* at 660. But in that case, the employer's attempt to recover previously disbursed sabbatical compensation was like "the withdrawal of [a] 'key benefit'" to an employee—a quintessentially retaliatory act. *Id.* (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 304 (6th Cir. 2012)). It would be establishing the rule at an unreasonably high level of generality to say that this decision put public officials on notice that filing any sort of lawsuit could amount to a constitutional violation.

---

depriving another of property interests." *Knology, Inc.*, 393 F.3d at 658. And it is well-settled that "filing a complaint in court is a form of petitioning activity." *McDonald v. Smith*, 472 U.S. 479, 484 (1985). Granted, this protection doesn't extend to "baseless litigation." *Id*. (quoting *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983)). But beyond a conclusory allegation in their complaint, Cox and Meade can point to nothing showing that the suit over the easement was meritless. And Ruckel's vote, even as a government official, to institute the quiet title suit was petitioning activity entitled to First Amendment protection. *See generally B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022) (holding that *Noerr-Pennington* doctrine protects "litigation activities brought by government officials to advance public goals"); *Mariana v. Fisher*, 338 F.3d 189, 200 (3d Cir. 2003) ("We know of no Supreme Court or federal appellate case holding that *Noerr-Pennington* cannot apply to government actors."); *New West L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("As far as the national government is concerned, a municipality has a right to speak and petition for redress of grievances, so the *Noerr-Pennington* doctrine applies fully to municipal activities."). And so it can't be an adverse action giving rise to a claim of First Amendment retaliation because this would be imposing direct liability for Ruckel's own protected conduct.

As a result, a reasonable officer standing in Ruckel's shoes wouldn't suspect that his vote to begin a quiet title action on the county's parking easement could rise to the level of a constitutional violation. And so even viewed in the light most favorable to them, Cox and Meade cannot show that any of Ruckel's actions violated their clearly established constitutional rights. Ruckel is entitled to qualified immunity.

**2.**

Next, we address Cox and Meade's claims against Thomas. Cox and Meade claim that Thomas participated in the harassment campaign and used her position as Magistrate to sue Cox and Meade to quiet title in the disputed area.

Begin with the alleged harassment. While the record shows that Cox and Meade suffered harassment over the bridge issue, the key problem for their claim against Thomas is that they have no evidence that she participated. Indeed, the only direct statement Cox and Meade point to as evidence of this harassment campaign is Thomas's offhanded comment that Cox was lucky that the people of Lewis County hadn't done more because "if this had been 25 years ago, they would have burnt her house." R.61, Thomas Dep., p.33, PageID 1423. But Cox and Meade do not claim that Thomas was part of the Troll of Cabin Creek Facebook Group or that she engaged in any of that group's activities on social media, which at times blurred the line between free speech and harassment. Indeed, the only specific instance of online harassment that Cox could point to in her deposition was Thomas's posting of a laughing response emoji on one of Cox's posts about the covered bridge debate.

Given the insignificant nature of this conduct, Cox and Meade can't show that Thomas deprived them of their constitutional rights. Still the couple argues that it is clearly established that retaliatory harassment amounts to a constitutional violation. This statement is true with a

caveat: "sufficiently serious" harassment can amount to a constitutional violation. *Spithaler v. Smith*, 803 F. App'x 826, 828 (6th Cir. 2020); *see also Rudd*, 971 F.3d at 514 (collecting examples). Placing a laughing emoji on someone's Facebook post does not. Our caselaw makes clear that citizens don't have a right "to sue over any governmental nuisance, no matter how inconsequential." *Rudd*, 977 F.3d at 514. And nothing in these cases should be construed to turn every piece of expression by a government official into a constitutional tort just because the plaintiff found it offensive. Thomas's comments fell within her right to respond to statements "that were made in the public sphere." *Fritz*, 592 F.3d at 727. And so her actions were not a constitutional violation.

Likewise, Thomas's vote on the quiet title action doesn't violate a constitutional right for much the same reason that Ruckel's didn't. And there was no published caselaw that put her on notice that such an act could amount to First Amendment retaliation. Without such notice, Thomas's vote couldn't violate clearly established law even if Cox and Meade could show that her vote was a constitutional violation. As a result, Thomas is entitled to qualified immunity.

**3.**

Last, we turn to whether the conspiracy claims against Ruckel and Thomas can survive the failure of the substantive retaliation claims. Recall that in the context of constitutional torts, a conspiracy must show "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Hooks*, 771 F.2d at 944. And while conclusory allegations about a single plan and shared conspiratorial objective, if pleaded with specificity, might be enough to survive a motion to dismiss, the same is not true at summary judgment. To survive a motion for summary judgment, the plaintiff must have enough evidence to allow a

reasonable inference of a conspiracy—not just the possibility of one. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153–57 (1970); *see also Gutierrez*, 826 F.2d at 1539 (holding that a district court doesn't err in dismissing conspiracy claims that "lack the requisite material facts"). And so a district court properly grants summary judgment on a conspiracy claim when "the uncontested facts establish that no conspiracy existed." *Yancey v. Carroll Cnty.*, 876 F.2d 1238, 1245 (6th Cir. 1989).

Viewed in the light most favorable to them, Cox and Meade's evidence cannot show a conspiracy. Unlike at the motion-to-dismiss phase, mere allegations are no longer sufficient. When challenged by a motion for summary judgment, a conspiracy claim cannot rest on "allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968). But Cox and Meade cannot point to any facts connecting Ruckel and Thomas beyond the fact that the two both happened to have positions on the Lewis County Fiscal Court. This is not enough. And neither are the complaint's conclusory allegations of a conspiratorial agreement and shared objective. More is required to make an inference of conspiracy reasonable. Without such supporting facts and evidence to bridge the gap, Cox and Meade's proposed "web of inference" becomes "too weak" to allow a finding a conspiracy "absent sheer speculation." *Bazzi v. City of Dearborn*, 658 F.3d 598, 603 (6th Cir. 2011) (internal quotation marks omitted). And so the district court didn't err in granting summary judgment on the conspiracy claims—the last of Cox and Meade's claims.

**IV.**

For all these reasons, we affirm.